UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
─────────────────────────────────────────

UNITED STATES OF AMERICA

-v-                                         21-CR-48 (JPO)

ISMAEL BIMBOW,                              ORDER
                        Defendant.
─────────────────────────────────────────

J. PAUL OETKEN, District Judge:

    Defendant Ismael Bimbow was charged with conspiring to distribute and possessing with intent to distribute 400 grams and more of mixtures and substances containing a detectable amount of fentanyl and mixtures and substances containing a detectable amount of heroin in violation of 21 U.S.C. §§ 841(b)(1)(A), 841(b)(1)(C), and 846, and with using and carrying a firearm during and in relation to a drug trafficking crime, in violation of 18 U.S.C. § 924(c).

    Following a jury trial, Bimbow was convicted on both counts on April 12, 2022. Bimbow then moved for judgment of acquittal or, in the alternative, for a new trial, which the Court denied. (*See* ECF No. 91.) Bimbow has now again moved for a new trial under Federal Rule of Criminal Procedure 33 and *Brady v. Maryland*, 373 U.S. 83 (1963), relying on material that Bimbow alleges was suppressed during his trial and only disclosed months later in another trial. For the reasons that follow, Bimbow's motion is denied.

**I.   Background**

    The Court assumes familiarity with the factual background and procedural history of this case as set forth in its previous opinions and recites only the facts here that are necessary to this motion. (*See* ECF Nos. 30, 59, 91.)

    Bimbow's current motion concerns evidence he alleges he learned only from reading the transcript in another trial, *United States v. Robert Shannon*, 21-cr-56 (JPC). Specifically,

Bimbow contends that the *Shannon* trial transcript reveals the existence of a chat among Drug Enforcement Agency ("DEA") agents ("*Shannon* DEA chat") from October 27, 2020. On that day, agents arrested Cooperating Witness 1 ("CW-1"), a witness who later testified in Bimbow's trial. Bimbow's arrest occurred a few weeks after that of CW-1. The *Shannon* DEA chat, Bimbow alleges, reveals two key pieces of evidence that the government improperly failed to turn over prior to his own trial: (1) that when agents first arrested CW-1, he was arrested alongside a third party, whose legal name is Kareem Roderique, but who initially falsely claimed to be "Ismael Bimbow," and (2) that while agents had CW-1 in custody on October 27, 2020, he had access to his phone and called and texted several people, attempting to set up a "sting" operation in cooperation with the agents. Contemporaneous texts between CW-1 and Bimbow were already in evidence at trial, but Bimbow claims that he was unaware that CW-1 was texting him *after* CW-1's arrest, while CW-1 was in custody.

Bimbow also alleges that the *Shannon* trial revealed previously undisclosed information about CW-1's level of involvement in a stash house located at North 15th Street and alleges that DEA Agent Todd Riley, who testified in both *Bimbow* and *Shannon*, gave testimony in the *Shannon* trial that contradicted testimony he gave at the *Bimbow* trial regarding his investigation of CW-1.

## II.     Legal Standard

Federal Rule of Criminal Procedure 33 provides: "Upon a defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). "[B]efore ordering a new trial pursuant to Rule 33, a district court must find that there is a real concern that an innocent person may have been convicted." *United States v. McCourty*, 562 F.3d 458, 475 (2d Cir. 2009) (internal quotation marks omitted). "The test is

whether it would be a manifest injustice to let the guilty verdict stand." *United States v. Sanchez*, 969 F.2d 1409, 1414 (2d Cir. 1992) (internal quotation marks omitted).

Supplemental factors guide specific application of Rule 33 to disputes involving newly discovered evidence. When relying on newly discovered evidence, the defendant must prove that

> (1) the evidence was newly discovered after trial; (2) facts are alleged from which the court can infer due diligence on the part of the movant to obtain the evidence; (3) the evidence is material; (4) the evidence is not merely cumulative or impeaching; and (5) the evidence would likely result in an acquittal.

*United States v. Forbes*, 790 F.3d 403, 406 – 07 (2d. Cir. 2015) (cleaned up).

Bimbow contends that he is entitled to a new trial because the *Shannon* proceeding revealed "newly discovered" evidence showing that the government committed a *Brady* violation. Under *Brady* and its progeny, the prosecution in a criminal case has a duty to disclose evidence that is favorable to the accused and material to guilt. That duty extends to impeachment information regarding government witnesses, *see Giglio v. United States*, 405 U.S. 150, 154 (1972), which is "evidence having the potential to alter the jury's assessment of the credibility of a significant prosecution witness." *United States v. Madori*, 419 F.3d 159, 170 (2d Cir. 2005) (internal quotation marks and citation omitted).

The government's duties under *Brady* and *Giglio* are violated if the government withholds information that, "if suppressed, would deprive the defendant of a fair trial." *United States v. Bagley*, 473 U.S. 667, 675 (1985). Such a deprivation occurs only where there is a "reasonable probability" that the suppression "affected the outcome of the case," or would have "put the whole case in such a different light as to undermine confidence in the verdict." *United States v. Coppa*, 267 F.3d 132, 135 (2d Cir. 2001) (citation omitted). Thus, there "is never a real '*Brady* violation' unless the nondisclosure was so serious that there is a reasonable probability

3

that the suppressed evidence would have produced a different verdict." *Strickler v. Greene*, 527 U.S. 263, 281 (1999).

Moreover, evidence is not "suppressed" under *Brady* "if the defendant or his attorney either knew, or should have known, of the essential facts permitting him to take advantage of that evidence." *United States v. Paulino*, 445 F.3d 211, 225 (2d Cir. 2006); *see also United States v. Payne*, 63 F.3d 1200, 1208 (2d Cir. 1995) (explaining that materials that the defense could have obtained "are not deemed suppressed if defense counsel should know of them and fails to obtain them because of lack of diligence in his own investigation").

To prove a *Brady* violation, "a defendant must show that (1) the government, either willfully or inadvertently, suppressed evidence; (2) the evidence at issue is favorable to the defendant; and (3) the failure to disclose this evidence resulted in prejudice." *Coppa*, 267 F.3d at 140.

### III. Discussion

Bimbow contends that testimony in the *Shannon* trial revealed previously undisclosed information that could have been used to impeach the credibility of the witnesses in his trial, particularly that of CW-1 and Agent Riley. Bimbow further contends that disclosure would have provided him with a means to establish a foundation to call as witnesses two of the arresting DEA agents. These arguments fail.

As an initial matter, the government actually *offered* to give Bimbow the entire *Shannon* case file prior to Bimbow's trial, an offer which Bimbow at that time refused. Bimbow cannot now credibly claim that this information was suppressed. (*See* ECF No. 101 at 2; *see also Paulino*, 445 F.3d at 225.)

Even leaving that aside, Bimbow already had constructive access to most of the information he now claims to have lacked and fails to show that it would have materially altered his trial in any way.

### A. CW-1's Immediate Cooperation With Law Enforcement

Bimbow argues that the *Shannon* DEA chat revealed that CW-1 "immediately" cooperated with law enforcement after his arrest by using his phone and contacts to set up "sting" operations. One of these operations resulted in the arrest of Shannon, and Bimbow alleges that CW-1 tried but failed to snare him as well. Bimbow suggests that this shows he was targeted in a way that would impeach CW-1's credibility.

CW-1's immediate cooperation, including providing information on Bimbow to government agents, was already clear from both the 3500 material that the government provided to Bimbow and from CW-1's own testimony at trial. For example, the government provided Bimbow with a DEA report documenting CW-1's arrest and stating that CW-1 "immediately began cooperating with agents." (*See also* ECF No. 101 at 9 – 10, detailing the extensive material about CW-1 provided to Bimbow in advance of his trial). CW-1 also testified to this fact at trial:

> Q: After your arrest, did you immediately start cooperating?
>
> A: Yes.

(Trial Tr. 479.)

That CW-1's cooperation included "immediately" providing information about Bimbow after CW-1 was first arrested was independently apparent from the 3500 material and CW-1's testimony at trial:

> Q: Did there come a point in time when you told the agents about the defendant?

>A: Yes.
>
>Q: And generally, what did you tell them about the defendant?
>
>A: He was calling my phone when I got arrested, and that's where I was and I told them [the agents] who he was.

(Trial Tr. 479.)

At a hearing on this motion, Bimbow elaborated that he specifically believed the *Shannon* information would have allowed him to cross-examine CW-1 about the order of the phone calls because Bimbow contends that *he* (that is, Bimbow) did not call CW-1 on that day but, instead, that CW-1 called *him.*

The government, however, had already turned over the call logs from that day. This call was either an iPhone Facetime or other internet call, and it is not reflected either way in the record. Moreover, at trial, Bimbow could have contested CW-1's account of the order of the calls because Bimbow clearly knew of the order of the calls. Yet at trial, Bimbow did not take the opportunity to cross-examine CW-1 about this point.

Bimbow also contends that he was surprised to learn from the *Shannon* transcript that CW-1 was using his phone while in custody. This fact too was constructively apparent from the materials provided to Bimbow before the trial, notwithstanding that Bimbow did not have the *Shannon* DEA chat. The government turned over both the time of CW-1's arrest and call logs detailing his phone activity on October 27, 2020. While this information was turned over as two separate items of evidence, put together, the two pieces of evidence clearly indicate that CW-1's text activity occurred *after* his arrest.

Overall, it was abundantly clear at trial that CW-1 quickly made himself helpful to law enforcement and specifically was immediately willing to provide information on Bimbow. Any further information provided in the *Shannon* DEA chat showing that CW-1 immediately

cooperated with law enforcement and that his cooperation aided in their investigation of Bimbow was not "new" information, nor can Bimbow show that the lack of even more evidence on this point prejudiced him.  These facts were already apparent both to Bimbow and the jury and, thus, even assuming this information was "new," it is at best merely cumulative.

      **B.**      **The Extent of CW-1's Criminal Activity**

Bimbow also contends that CW-1 portrayed himself at the *Bimbow* trial as a mere middleman, while the *Shannon* trial revealed that to be untrue.  Specifically, Bimbow argues that the evidence at his trial obscured the significant extent of CW-1's involvement in criminal activities at a stash house located on North 15th Street in East Orange, New Jersey.

But again, the extent of CW-1's involvement with the North 15th Street stash house was already clear from the material the government provided to Bimbow prior to trial, which included proffer notes indicating that CW-1 had sold substantial quantities of narcotics and that CW-1 was the one who "got access to" the stash house.  The government also provided proffer notes from a different confidential source who helped arrange CW-1's arrest, which describe CW-1 as bragging about owning multiple large-scale heroin and fentanyl operations.  (*See* ECF No. 101 at 12 – 14.)  If Bimbow wished to impeach CW-1's credibility by pointing to CW-1's own criminal activity, he had ample information and opportunity to do so.

Bimbow further contends that this information indicates that Agent Todd Riley, who testified in both the *Bimbow* and *Shannon* trials, perjured himself at Bimbow's trial regarding his investigation of CW-1.  This is inaccurate and relies on a misleading characterization of Riley's testimony.  Riley testified that he investigated CW-1 for a cocaine transaction and that he was unfamiliar with the charges to which CW-1 ultimately pleaded. (*See* ECF Nos. 101 at 15 – 16; 105 at 2.)  As part of CW-1's plea, he confessed to crimes beyond the cocaine transaction for which Riley investigated him, and as part of his cooperation with law enforcement, he provided

information on his heroin and fentanyl mill.  This is consistent with Riley's testimony at both trials and with the general practice regarding cooperators and plea deals.

        C.        **The False Identification of Ismael Bimbow**

The undisputed new piece of evidence that the *Shannon* DEA chat revealed was that when agents arrested CW-1 along with Kareem Roderique, Roderique falsely identified himself as "Ismael Bimbow."[1]  Bimbow stated at the hearing on this motion that he had never met Roderique and that therefore only CW-1 could have been the source of the idea to falsely pretend to be "Ismael Bimbow."  Bimbow contends that this information could have undermined CW-1's credibility and altered the outcome of the case.

This argument overstates the importance of CW-1 to the government's case.  Rule 33 requires that, for a court to order a new trial, the information revealed must be "material" and "likely to produce an acquittal."  The evidence in this case was overwhelming, as the Court noted previously.  (*See generally* ECF No. 91.)  Bimbow himself admitted at trial to trafficking large quantities of narcotics (*see* ECF No. 90 at 13 – 15), possessing drugs and drug paraphernalia, and owning guns found in the garage of his apartment and a hidden compartment in his car.  (*See* ECF Nos. 77 at 148:10–152:14; 83 at 896:3–5, 895:25–896:5, 919:5–9; GX 202A).

The only defense that Bimbow presented was improper venue.  At oral argument on this motion, Bimbow indicated that his primary objection to his verdict is that he was convicted for participating in a "conspiracy" with CW-1, which he still denies while admitting to the rest of the allegations.  But the government made an overwhelming showing that Bimbow's drug activity involved co-conspirators, including *but not limited to* CW-1.  The distinction Bimbow seeks to

---

[1] Bimbow asserts that either CW-1 or Roderique could have been the one to falsely claim Bimbow's identity.  The *Shannon* record is clear that the person claiming to be Bimbow was Roderique, not CW-1.

draw could have had no impact on the verdict of his trial given his own testimony and the rest of the evidence. Indeed, none of the evidence Bimbow identifies, whether new or not, meets the standard for materiality under either Rule 33 or *Brady*. Bimbow has not shown that this additional disclosure related to the events of October 27, 2020, when the government arrested CW-1, Roderique, and Shannon, would have materially altered the events of Bimbow's trial.

Bimbow also suggested at the hearing that, had the *Shannon* DEA chat information been available to them prior to the *Bimbow* trial, then Bimbow would not have taken the stand, thereby materially altering the outcome of the case. This argument is unpersuasive. There is no plausible basis for concluding that having this information would have resulted in a different decision about testifying or, in any event, a different verdict, given the evidence of guilt. The fact is that Bimbow did take the stand and admitted to the crimes with which he was charged; he merely claimed that they all occurred in New Jersey. Rule 33 and *Brady* are meant to prevent manifest injustice, not to offer defendants a second bite if they regret their own choices at trial.

### D. Special Agents Greeley and Ramirez

Finally, Bimbow argues that the contents of the *Shannon* DEA chat could have provided a basis for him to call Special Agents Greeley and Ramirez to testify at trial. This is well-trodden ground in this case. Before his trial, the Court informed Bimbow that relitigating the motion to suppress the evidence recovered from the execution of the warrants and attacking the investigation's methods were improper bases for calling these agents. (*See, e.g.*, ECF No. 75 at 5:13 – 22, 6:23 – 7:4.) During the trial, Bimbow again failed to provide a proper basis for calling these agents. (*See, e.g.*, ECF No. 91 at 10.) And after the trial, Bimbow moved for a new trial under Rule 33 because he had been unable to call these agents, and the Court again explained that he had not provided a proper basis to call them. (*Id.*)

9

That has not changed. The *Shannon* DEA chat still does not provide a proper basis for calling these agents to testify. As the Court has repeatedly explained, the methods of the investigation leading to Bimbow's arrest are not at issue in this case, and Bimbow fails to give any other reason why the *Shannon* DEA chat might be relevant. Ultimately, Bimbow's motion fails to meet the standards for a new trial under Rule 33 or of a *Brady* violation as the information at issue is largely not new and is not material.

## IV.   Conclusion

For the foregoing reasons, Bimbow's motion for a new trial under Rule 33 and *Brady* is denied.

The Clerk of Court is directed to close the motion at ECF Number 98.

SO ORDERED.

Dated: May 18, 2023
　　　 New York, New York

_____
J. PAUL OETKEN
United States District Judge